UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/27/2024
```

-----------------------------------------------------------------------X
                    :

DENISE NICOLE GILPIN,          :

          Plaintiff,     :

                    :         23-cv-6758 (LJL)

     -v-             :

                    :     OPINION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,    :

         Defendant.    :

                    :

-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Denise Nicole Gilpin ("Plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) seeking judicial review of a final decision of the Commissioner of Social Security

("Defendant" or the "Commissioner") denying Plaintiff's application for Disability Insurance

Benefits for lack of disability.  Dkt. No. 1.  Plaintiff moves for judgment modifying or reversing

the decision of the Commissioner, Dkt. No. 13, and the Commissioner cross-moves for judgment

affirming the decision of the Commissioner, Dkt. No. 14.  For the following reasons, Plaintiff's

motion is granted, and Defendant's motion is denied.  The case is remanded to the Commissioner

for further proceedings.

## BACKGROUND

      The following facts are taken from the administrative record (the "Record") filed in

connection with this action.  Dkt Nos. 9, 9-1, 9-2, 9-3 ("Ad. Rec.").[1]  The Record contains

Plaintiff's medical history, information she provided in support of her applications for benefits,

---

[1] Dkt. Nos. 9, 9-1, 9-2, and 9-3 are paginated consecutively and are cited here as one continuous
document.

opinions from several medical and psychological examiners, the transcript of Plaintiff's hearing before the ALJ, and the ALJ's decision.

## I.    Background

Plaintiff was born in 1974 and was forty-six years old at the alleged onset date ("AOD") of her disability on October 18, 2020. *Id.* at 188. She is a resident of Poughkeepsie, New York and earned a bachelor's degree from Marist College in 2011. *Id*. at 189, 229, 716. Before her AOD, Plaintiff worked as a store manager, an administrative assistant, and as a receptionist. *Id.* at 212, 222.

Plaintiff's disability claim is based on five alleged impairments: polyarthritis, fibromyalgia, neuropathy, lumbar degenerative disc disease, and schizoaffective disorder. *Id*. at 15. Plaintiff reports that she developed schizoaffective disorder when she was 28 years old and was hospitalized for it in 2003, 2012, and 2020. *Id*. at 820–21. The 2020 hospitalization coincides with the alleged onset of her disability. *See id*. at 266, 331.

At that time, Plaintiff was laid off from her job as a receptionist. *Id*. at 211, 237. Plaintiff states that she lost her job because of her "condition(s)," and her mother specifies that she was terminated "for always[s] being late" while she was "in crisis." *Id*. Plaintiff has not worked since her AOD. *Id*. at 39, 211. She received offers to work as a package handler at a FedEx facility and as a receptionist at a nursing home, but declined both offers. *Id*. at 39–40. She expressed a desire to find a clerical job that will allow her to work in an office setting on a part-time basis. *Id*.

Plaintiff reports living in an apartment alone and taking care of herself without assistance. *Id*. at 35, 40–41, 242–45. She also reports no difficulty in day-to-day activities such as cooking, cleaning, driving, visiting with friends, doing laundry, and shopping. *Id*. Plaintiff's mother

reports that when Plaintiff is "stable" and on medications she can do such chores, but when "in crisis" she has substantial difficulty. *Id*. at 231–38.

## II.    Medical Background

### A.    Physical Impairments (Polyarthritis, Fibromyalgia, Neuropathy, Lumbar Degenerative Disc Disease).

Plaintiff was treated for her physical impairments by Steven B. Jacobs, D.O. Plaintiff's medical records indicate she visited Dr. Jacobs at least eight times between October 6, 2020—just before her AOD—to October 7, 2021. *Id.* at 303–29. As part of the agency's review of Plaintiff's application, Plaintiff was also seen by Dr. Kautilya Puri, M.D., for a consultative examination on September 7, 2021. *Id*. at 725–29.

#### 1.    Treatment Records from Dr. Jacobs

The earliest record of Plaintiff's treatment with Dr. Jacobs made available to the ALJ comes from a visit on October 7, 2020. Dkt No. 9 at 327–29. During this visit, Plaintiff reported "diffuse muscle aches" and intermittent pain throughout her body. *Id*. at 327. Dr. Jacobs reported Plaintiff was suffering from fibromyalgia and migraine. *Id*. at 329. To help alleviate these conditions, Dr. Jacobs prescribed bupropion and acetaminophen. *Id*. On October 29, 2020, Plaintiff presented with leg pain, and Dr. Jacobs assessed Plaintiff as having polyarthritis of "unclear etiology." *Id*. at 324–26. Dr. Jacobs did not issue a new prescription at this time, instead recommending Plaintiff take Advil. *Id*.

Plaintiff returned to Dr. Jacob's office on December 7, 2020, complaining of bilateral leg pain, a burning sensation in her feet, numbness, and weakness. *Id*. at 321–23. Dr. Jacobs noted Plaintiff suffered from neuropathy of unclear etiology. *Id*. at 323. Plaintiff began taking gabapentin to help alleviate her symptoms. *See, e.g.*, *id.* at 318–19. Plaintiff returned for a

follow-up visit with Dr. Jacobs on January 11, 2021. *Id*. at 318–20. Dr. Jacobs noted that Plaintiff's neuropathy had improved with gabapentin. *Id*.

During Plaintiff's next visit on February 19, 2021, Dr. Jacobs assessed Plaintiff with "stable" fibromyalgia, and noted Plaintiff "feels well." *Id*. at 314, 316. Plaintiff reported lumbar pain during her follow-up appointment on June 1, 2021, leading Dr. Jacobs to prescribe Plaintiff acetaminophen and codeine. *Id*. at 311–12.

Plaintiff's final visit with Dr. Jacobs before her ALJ hearing was on October 6, 2021. *Id*. at 305–07. She presented with kidney issues that Dr. Jacobs assessed as likely the result of an infection. *Id*. During this visit, Dr. Jacobs ordered, among other tests, a CT scan which was performed the following day. *Id*. at 307. The results of this scan showed that Plaintiff had "[m]ild broad-based disc bulges noted at L3-4 through L5-S1." *Id*. at 304.

Plaintiff reported that she has not sought out nor received any additional treatment for her physical impairments between her last visit with Dr. Jacobs and the date of her ALJ hearing on May 10, 2022. *Id*. at 33, 44, 330.

## 2. Plaintiff's Self-Report

Plaintiff reports that she feels pain every day in her lower back, legs, arms, feet, hands, and around her neck. *Id*. at 42. The pain comes and goes, but she has noticed that it is present in the morning when she gets up. *Id*. at 42. If she bends over, for example to brush her teeth, she has a hard time straightening up. *Id*. at 43. Because of her neuropathy, she is not able to stand or walk for more than two hours consecutively and needs to rest after walking a couple of miles. *Id*. at 246. Plaintiff also reports difficulty keeping a firm grasp on heavier objects, causing her to "drop things a lot." *Id*. at 44. She is currently on medication for neuropathy and is taking natural supplements for her fibromyalgia and arthritis. *Id*. at 42–43.

### 3.    Consultative Examination by Dr. Puri

During the initial review of Plaintiff's SSDI application, a consultative examination ("CE") was performed by Kautilya Puri, M.D., on September 7, 2021.  *Id*. at 725–29.  Dr. Puri noted Plaintiff's history of neuropathy, fibromyalgia, aching pains throughout her body, and her lower back condition.  *Id*. at 725.  During the examination, Dr. Puri observed that Plaintiff did not need an assistive device to move, was able to walk on her heels and toes "without difficulty," and did not need any assistance during the examination.  *Id*. at 726.

Plaintiff's examination was largely normal, except for lumbosacral back tenderness on palpation and movement, non-trigger point areas of tenderness, and trigger points for her neck, shoulders, arms, ribs, back, and legs.  *Id*. at 727.  Dr. Puri concluded Plaintiff suffered from fibromyalgia and disc disease that caused pain, but the doctor went on to note that she had "no objective limitations" to her fine or gross motor activity, gait, or activities of daily living.  *Id*. at 727–28.  Dr. Puri did conclude Plaintiff had "mild limitations" to squatting, bending, stopping, kneeling, and lifting weights.  *Id*. at 728.  Dr. Puri also recommended Plaintiff be seen by an orthopedic doctor and a psychiatrist.  *Id*.

### B.    Mental Impairment (Schizoaffective Disorder)

Evidence of Plaintiff's mental impairment, schizoaffective disorder, comes primarily from treatment notes from her primary mental health care provider, Spectrum Behavioral Management Services, between 2015 and 2022.  Additional evidence comes from records of Plaintiff's emergency room visit and subsequent admission to MidHudson Regional Hospital in October–November 2020, as well as Plaintiff's and her mother's reports of her symptoms.

1.    **Pre-AOD Records from Spectrum Behavioral Management Services.**

The Record contains records from over sixty visits to Spectrum Behavioral Management Services between June 2015 and March 2022.[2]  *Id.* at 730–848.  From June 2015 through May 2021, Plaintiff was seen exclusively by Nurse Practitioner ("NP") Hani Khalil.  *Id.* at 730–818.  Starting in June 2021, Plaintiff was seen by both NP Khalil and Licensed Clinical Social Worker ("LCSWR") Yogesh M. Shingala.  *Id.* at 820–48.  Plaintiff's last reported visit with LCSWR Shingala was on August 12, 2021, and from that time until her hearing in 2022, she was seen only by NP Khalil.  *Id.* at 835, 847–48.

In the first session documented on the Record, on June 19, 2015, Plaintiff complained to NP Khalil that she felt "restless" and "uncomfortable" on her current prescription regimen.  *Id.* at 731.  Plaintiff nonetheless confirmed to NP Khalil that her condition was generally good.  *Id.* NP Khalil's notes state there were no apparent signs of Plaintiff experiencing hallucinations or paranoia.  *Id.*  While describing Plaintiff as "slightly restless in seat [sic]" and "look[ing] tired and distracted," NP Khalil's examination found Plaintiff's associations "intact," thinking logical, and thought content appropriate.  *Id.*  To help alleviate her reported prescription side effects, NP Khalil lowered Plaintiff's dosage of fluphenazine.[3]  *Id.*  This treatment note and all subsequent records from Plaintiff's treatment at Spectrum Behavioral Management Services identify Plaintiff's sole diagnosis as "[p]aranoid type schizophrenia, unspecified, 295.30 (F20.0) (Active)."  *Id.* at 731–847.

---

[2] It is not clear from these treatment notes when Plaintiff began her treatment at Spectrum Behavioral Management Services.  The earliest treatment note included on the record, which is from June 19, 2015, clearly indicates Plaintiff was already an established patient by the time of this visit.  *See, e.g.*, Ad. Rec. at 731.

[3] Plaintiff's treatment notes refer to the same medication by a generic name at some points and a brand name at other points.  For clarity, the Court uses a single name for each medication.

For the next fourteen months, Plaintiff's treatment with NP Khalil was largely uneventful. *Id*. at 732–44. At no point during these visits did Plaintiff report, or NP Khalil observe, any signs of hallucinations or paranoia. *Id*. NP Khalil did, however, counsel Plaintiff on "the need for compliance with all medical instructions, particularly having to do with medication," during her visit on October 9, 2015, and discussed noncompliance again on June 28, 2016. *Id*. at 736, 743. At her next appointment on August 16, 2016, Plaintiff admitted to "ongoing" auditory hallucinations, and NP Khalil reported that "[o]thers" described Plaintiff as exhibiting behaviors consistent with hallucinations. *Id*. at 745.

To deal with this new onset of symptoms, NP Khalil increased the dosage of Plaintiff's fluphenazine prescription. *Id*. Plaintiff reported continued-but-lessened symptoms during a subsequent visit in October of 2016, and at the next visit in December 2016 reported no psychiatric symptoms and presented with "basically appropriate" behavior and affect. *Id*. at 747, 749. Plaintiff did not report hearing voices or feeling paranoid again from December 2016 through May 2018. *Id*. at 749–70. NP Khalil counseled Plaintiff on the importance of complying with her medication regimen and healthcare instructions on four occasions during this period. [4] *See, e.g.*, *id*. at 750, 758, 764, 766. [5]

During Plaintiff's visit with NP Khalil on June 28, 2018, she once again reported hearing voices and feeling paranoid. *Id*. at 772. NP Khalil described Plaintiff as "in tears," noting

---

[4] NP Khalil counseled Plaintiff on the importance of medical compliance in treatment notes from visits on February 17, 2017; October 14, 2017; March 3, 2018; and March 22, 2018. Ad. Rec. at 750, 758, 764, 766.

[5] Plaintiff's prescriptions were also adjusted during this time, with NP Khalil prescribing Wellbutrin to help her quit smoking on April 15, 2017. *Id.* at 752. However, the treatment was discontinued on October 14, 2017, after Plaintiff complained of feeling tired while on the drug. *Id.* at 758. Plaintiff wanted to try Wellbutrin again on April 27, 2018, but reportedly stopped taking it not long after due to weight gain. *Id.* at 768, 770. NP Khalil also increased Plaintiff's fluphenazine dosage, and added benztropine, on March 22, 2018. *Id.* at 766.

Plaintiff's belief that "thoughts are being taken out or withdrawn from her mind." *Id*. During this visit, NP Khalil counseled Plaintiff on the need for medical compliance, good nutrition, and exercise. *Id*. NP Khalil also prescribed Plaintiff the drug Latuda. *Id*. Plaintiff described improvements in her symptoms during her next visit with NP Khalil on June 12, 2018. *Id*. at 774. Plaintiff stated that she stopped taking her prescribed Latuda because it "made her depressed," but that she was feeling good with fluphenazine and had no hallucinations or delusions. *Id*. NP Khalil discontinued Latuda. *Id*.

After several uneventful visits, Plaintiff again reported hallucinations and feelings of paranoia on November 30, 2018. *Id*. at 778. She stated that she had been hearing voices and feeling paranoid but did not report it before because she thought it would go away. *Id*. She stated now that she could not handle it anymore and needed help. *Id*. NP Khalil prescribed her risperidone in addition to her existing prescriptions for fluphenazine and Xanax. *Id*.

Plaintiff reported both continued symptoms and new side effects from risperidone during her follow up appointment on December 19, 2018, but stated that she wanted to try the drug for another month. *Id*. at 780. By January 18, 2019, Plaintiff stopped taking risperidone, reporting that fluphenazine was helping and that she had no hallucinations or delusions. *Id*. at 782. NP Khalil discontinued Plaintiff's risperidone prescription. *Id*.

On February 8, 2019, Plaintiff reported some "less intense" voices and paranoia. *Id*. at 784. Through the rest of 2019 and early 2020, Plaintiff did not report psychotic symptoms, and treatment notes indicate generally appropriate behavior. *Id*. at 786–96.

On July 8, 2020, Plaintiff reported hallucinations and paranoia to NP Khalil. *Id*. at 797. She stated that her current dose of fluphenazine did not control the voices but the higher dose she was formerly taking made her very tired. *Id.* NP Khalil prescribed risperidone during this visit,

but a few weeks later Plaintiff stopped taking it due to nausea.  *Id*. at 797, 799.  Plaintiff denied

hallucinations and paranoia at visits on July 31, 2020 and September 15, 2020.  *Id*. at 799–801.

On October 23, 2020, Plaintiff reported that she was "still" hearing voices, and NP Khalil

stated that her symptoms "have increased in frequency or intensity."  *Id*. at 803.  He stated that

Plaintiff was "slightly anxious" and described her affect as "constricted," but he added that

Plaintiff was perceiving no hallucinations or delusions during the session, and her insight and

judgment were "fair to good."  *Id*.  Plaintiff stopped taking fluphenazine as it "did not help with

voices," so NP Khalil prescribed risperidone and clonazepam to mitigate her symptoms.  *Id*.

### 2.    MidHudson Regional Hospital Records.

On October 30, 2020, Plaintiff was taken by ambulance to the emergency department

("ER") of MidHudson Regional Hospital ("Hospital").  Ad. Rec. at 351.  The administrative

record contains over 300 pages of treatment notes and other documentation from her hospital

stay, which concluded about two weeks later on November 13, 2020.  *Id.* at 331–660.

Upon arrival to the ER, Plaintiff's records indicate that she had "stopped taking

antipsychotics and is experiencing auditory and visual hallucinations."[6]  *Id.* at 364, 369.

Specifically, Plaintiff was hearing voices and believed people were in or outside her apartment.

*Id*.  While in the hospital, Plaintiff received extensive medications, diagnostic tests, and

specialist evaluations.  *See, e.g.*, *id*. at 402–17 (medications administered), 436–49 (diagnostic

testing performed), 424–26 (evaluations ordered).  For much of her visit, staff reported that

Plaintiff was noncompliant with her treatment plan and denied having a mental health issue.  *See,*

*e.g.*, *id*. at 372 (medical staff), 516–19 (nursing staff).  However, on her discharge date, nursing

---

[6] This statement is partially corroborated by records of Plaintiff's visit to her primary care
provider the day before, who reported that Plaintiff had stopped taking her medication and
presented as "off," "angry," and "irritable."  Ad. Rec. at 324–26.

staff described her as "pleasant and cooperative," albeit "internally preoccupied." *Id*. at 515. Her discharge notes describe her as understanding of her outpatient treatment needs. *Id*. at 397.

### 3.    Post-AOD Records from Spectrum Behavioral Management Services

Following her hospitalization, Plaintiff resumed her outpatient treatment with NP Khalil on November 20, 2020. *Id*. at 805. At this visit, NP Khalil discontinued Plaintiff's risperidone prescription because Plaintiff stated it did not help her. *Id*. Plaintiff described no symptoms, and NP Khalil did not observe any on examination. *Id*. At a follow-up appointment on December 18, 2020, NP Khalil described Plaintiff as "improved," "less depressed," and "more social." *Id*. at 807.

On February 4, 2021, Plaintiff complained of hearing voices. *Id*. at 808. She was also reportedly "unhappy with her meds," and NP Khalil modified her prescriptions by discontinuing fluphenazine and adding risperidone and lorazepam. *Id*. At a follow-up appointment on February 12, 2021, Plaintiff reported the voices had stopped, and treatment notes from March and April 2021 describe Plaintiff as doing well. *Id*. at 810–15. On May 26, 2021, Plaintiff had switched her medications from risperidone to prolexin and presented with "blunted" affect and "impaired" insight and judgment. *Id*. at 816. On June 22, 2021, NP Khalil reported that "voices stopped and the paranoia is better," but Plaintiff stated it was "hard to work and stay focused due to her mental health," and she again presented with blunted affect and impaired judgment. *Id*. at 818.

Concurrent with her treatment by NP Khalil, Plaintiff began telehealth treatment with Yogesh M. Shingala, LCSWR, also of Spectrum Behavioral Management Services, on June 24, 2021. *Id*. at 820–26. In their first session, LCSWR Shingala conducted a "Complete Evaluation" and "Biophysical Assessment" of Plaintiff's mental condition. *Id*. During this assessment, Plaintiff reported having schizoaffective disorder since she was 28 years old (i.e., in

2003). *Id*. at 820.  She reported that she was hospitalized for psychiatric reasons in 2003, 2012, and most recently in 2020. *Id*. at 821.

LCSWR Shingala reported that Plaintiff was currently in distress due to hearing negative male voices, although medications were "somewhat helping her." *Id*. at 820.  LCSWR Shingala identified the following symptoms experienced by Plaintiff: auditory hallucinations in the form of voices, thoughts that others were thinking about her even though she knew it was not true, anxiety, the subjective feeling of anxiety, sleep disturbance caused by anxiety, the avoidance of certain situations "because they invoke anxiety," the subjective feeling of apprehension, irritability, and hypervigilance. *Id*.  When recounting Plaintiff's medical history, LCSWR Shingala described Plaintiff's 2020 hospitalization as the result of psychosis which developed "as she stopped medications." *Id*. at 821.  LCSWR Shingala described Plaintiff as "[s]ensitive to many medications," particularly risperidone. *Id*. at 825.  LCSWR Shingala described Plaintiff as "[m]ostly compliant" with prescribed medications. *Id*. at 822.  LCSWR Shingala described Plaintiff as "friendly, attentive, communicative . . . but appears anxious." *Id*. at 825.

The record also contains LCSWR Shingala's treatment notes from four additional telehealth sessions through August 2021. *Id*. at 827–28, 831, 835.  At her appointment on July 1, Plaintiff described receiving a full-time job offer from a nursing home. *Id*. at 827.  LCSWR Shingala wrote Plaintiff was "excited" about the prospect of working there, but "not sure of the benefits and other requirements." *Id*.  Plaintiff also expressed concern about hearing "her intermittent voices." *Id*.  LCSWR Shingala noted that "[w]hen explored, Denise suggested how she has hard times maintaining the jobs," and "[s]uggested she may start part time work." *Id*. The session focused on emotional support and education about symptoms. *Id*.

In her follow-up visit on July 8, Plaintiff had reconsidered her job readiness and stated she would not accept full time work in the second shift "without any benefits." *Id*. at 828. Instead, Plaintiff described an interest in part-time work during the day that "she thinks she may be able to handle [] better." *Id*. Plaintiff expressed "her concerns over the voices," and there was extensive discussion around different strategies to deal with the voices. *Id*. The session focused on "reducing symptoms" and "remaining stable and symptom free." *Id.* However, at a visit with NP Khalil on the same day, Plaintiff stated that the voices had stopped and "denied paranoia." *Id.* at 829.

In her appointment with LSCWR Shingala on July 21, Plaintiff discussed several interviews with prospective employers and stated she would be better off working part-time for now. *Id*. at 831. This session focused on coping with anxiety and helping Plaintiff quit smoking. *Id*. In her final appointment with LCSWR Shingala, on August 12, 2021, Plaintiff reported "feeling better" and that medications were helping her. *Id*. at 835. She stated she was not hearing voices. *Id*. This note also refers to "others" reporting Plaintiff appears to have "significantly improved," specifically with regards to suspicion and paranoia. *Id*.[7]

On August 10, 2021, Plaintiff visited NP Khalil, who described her as improved and more social but also reported she had a blunted affect and impaired judgment. *Id.* at 833. NP Khalil's notes from September 2021 through January 2022 describe Plaintiff as doing well and presenting largely normally, though with somewhat anxious mood. *Id.* at 838–45.

---

[7] The administrative record contains treatment notes from LCSWR Shingala for two additional visits in August 2021, but these notes only document the fact that Plaintiff cancelled these appointments. *Id.* at 836–37.

### 4.    Plaintiff's Self-Report

Plaintiff states that since her 2020 hospitalization for schizoaffective disorder, she has been hearing voices and feeling paranoia.  *Id.* at 45.  She reports feeling that other people are talking about her while she is out in public, particularly at work.  *Id.* at 45–46, 247.  She describes this as "a really big problem," stating that "I can't go to public places without experiencing some kind of delusion."  *Id.* at 45.  She also has auditory hallucinations that lead her to hear voices throughout the day.  *Id.* at 45–46, 246.  She reports that in her prior job, she "sat there for five years and literally heard voices all day, every day throughout the day . . . but we finally got most of that under control with medication."  *Id.* at 45.  However, she still hears voices and is told that she will never stop hearing them.  *Id.* at 45–46.  She states that this prevents her from talking and from completing tasks.  *Id.* at 246.

Plaintiff states that she spends much of her time alone at home because of social anxiety, which is corroborated by her mother's third-party function report.  *Id.* at 235, 257.  Even at home, she sometimes thinks people are talking about her.  *Id.* at 45.  She reports that she has trouble watching television programs because she believes the people on screen are talking about her, but with medication she can watch them.  *Id.*  245.

Finally, Plaintiff reports symptoms due to the side effects of her medications.  *Id.* at 242.  Plaintiff reports that the medications to manage her hallucinations and paranoia cause nightmares, restlessness, difficulties with concentration and memory, fatigue, and vision problems.  *Id*. at 45–46, 245–46, 248.  Plaintiff takes other medications to help her sleep, but this makes it very hard to get up in the morning because the sleep medications are "very powerful" and take time to wear off.  *Id.* at 46.  Plaintiff's mother reports that when Plaintiff worked, she was "always late to work."  *Id.* at 232.

Plaintiff reports that her ability to focus is limited to one hour. *Id.* at 246–47. She states that she is able to follow written and spoken instructions "very well," finish tasks she starts, and get along well with authority figures at work. Id. at 246–47.

## III.    Application for Social Security Benefits

Plaintiff filed her initial claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("SSDI") with the Social Security Administration (the "Administration" or "SSA") on July 21, 2021. Dkt. No. 9 at 186, 188.

### A.    Initial Determination

The Administration initially denied Plaintiff's application on September 13, 2021. *Id.* at 102. A reviewing physician opined from the available records that Plaintiff had no medically-determinable physical impairment. *Id.* at 58.

A reviewing psychologist, Dr. Sherer, found certain impairments but concluded that Plaintiff was "not disabled." *Id.* at 68. Dr. Sherer assessed Plaintiff's mental impairment as "severe," with "mild" limitations on Plaintiff's ability to understand, remember, or apply information and "moderate" limitations on Plaintiff's ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *Id.* at 59. Dr. Sherer assessed Plaintiff as "[m]oderately limited" in five of twenty functional categories: "to maintain attention and concentration for extended periods," "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "to interact appropriately with the general public," and "to respond appropriately to changes in the work setting." *Id.* at 62–64. Dr. Sherer described symptoms of Plaintiff's schizoaffective disorder were "stabilized by medication." *Id.* at 65. Ultimately, Dr. Sherer found Plaintiff had the

capacity to "understand and remember routine instructions and procedures," "sustain an independent routine over the course of a normal 40-hour workweek," "respond in an appropriate manner to co-workers and supervisors" and "to cope with basic changes and make routine decisions." *Id*. Dr. Sherer noted, however, that Plaintiff "may have occasional lapse[s] in focus," "would have difficulty functioning in a setting that involved significant contact with the general public," and had "some difficulty with adaption." *Id*.

### B.    Reconsideration

Plaintiff applied for reconsideration of her SSDI denial on September 14, 2021. *Id*. at 108. On reconsideration, her mental capacity was assessed by Dr. Bruni, who affirmed Dr. Sherer's initial assessment. *Id*. at 84–85. Dr. Bruni found that Plaintiff's impairment was "severe" and that it caused the same mild-to-moderate limitations identified by Dr. Sherer. *Id*. at 59, 78. Dr. Bruni found Plaintiff to be "[m]oderately disabled" in six categories, including the five categories identified by Dr. Sherer as well as in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Id.* at 65, 84–85. In addition to the explanation given by Dr. Sherer, which was repeated, Dr. Bruni cited treatment notes from October 2021 and January 2022, after Dr. Sherer's assessment, that respectively noted "no psychiatric symptoms" and "mental status WNL, with the exception of constricted affect." *Id*. at 84. Dr. Bruni suggested that "[d]espite severe psychiatric impairment," Plaintiff was overall able to work. *Id*. at 84–85. [8]

---

[8] Plaintiff's physical condition was reviewed on reconsideration by Dr. Angelotti, who affirmed the prior assessment in the absence of new evidence supporting Plaintiff's physical disabilities. *Id.* at 77.

IV.    **ALJ Hearing and Report**

Plaintiff then requested a hearing by an administrative law judge ("ALJ"), which occurred via teleconference on May 10, 2022.  *Id*. at 13.  At the hearing, the ALJ heard testimony from both the Plaintiff herself and vocational expert Cherie Plante.  *Id*. at 28. Plaintiff's non-attorney representative Matthew Nutting attended the hearing but did not actively participate.  *Id*.  The record on review included prior Agency decisions regarding Plaintiff's applications, jurisdictional documents, employment summaries, various Agency-generated reports, and Plaintiff's medical records.  *Id*.  After reviewing the evidence, the ALJ issued a written decision finding Plaintiff did not qualify for SSDI benefits.

The ALJ applied the Administration's five-step sequential evaluation process to review Plaintiff's claim.[9]  *Id*. at 14 (citing 20 C.F.R. § 404.1520(a)).  Because Plaintiff has not held a job since her AOD, the ALJ found she had not engaged in substantial gainful activity at step one. *Id*. at 15 (citing 20 C.F.R. § 404.1571 *et seq*.).  The ALJ then found Plaintiff's alleged impairments—schizoaffective disorder, polyarthritis, fibromyalgia, neuropathy, and lumbar degenerative disc disease—to be sufficiently severe to satisfy step two.  *Id*. ("The above medically determinable impairments significantly limit the claimant's ability to perform basic work activities." (citing 20 C.F.R. § 404.1520(c))).  The ALJ found Plaintiff's impairments fail to satisfy step three, however, as even combined they do not "meet[] or medically equal[] the severity of one of the listed impairments" in the Administration's regulations.  *Id*. (citing 20

---

[9] The five steps are: (i) assessing whether a claimant is performing substantial gainful activity that would disqualify them from benefits; (ii) assessing whether a claimant's impairments are not sufficiently severe so as to disqualify for benefits; (iii) assessing whether a claimant's impairments satisfy criteria to automatically find the claimant disabled; (iv) assessing a claimant's residual functional capacity to perform prior work so as to disqualify them from benefits; and (v) assessing a claimant's residual functional capacity to perform other work so as to disqualify them from benefits.  20 C.F.R. § 404.1520(a)(4)(i)–(v).

C.F.R. §§ 404.1520(d), 404.1525, 404.1526; Appendix 1 to Subpart P of Part 404, Title 20).

Therefore, the ALJ continued to steps four and five.  20 C.F.R. § 404.1520(a)(4).

The ALJ's conclusions regarding steps four and five depend on the same assessment of Plaintiff's residual functional capacity ("RFC").[10]  In assessing Plaintiff's RFC, the ALJ found that Plaintiff was able to perform light work with certain additional physical restrictions and limitation to "simple, routine tasks with regular breaks at two-hour intervals, decision-making and changes in the work setting commensurate to those found in simple, routine tasks, and occasional interaction with coworkers, supervisors, and the public."  Record at 20.  Based on the testimony of a vocational expert, this residual capacity was not sufficient to allow Plaintiff to perform her past relevant work as a receptionist, administrative assistant, stock clerk, and retail store manager.  *Id.* at 21.  However, it was sufficient to allow the claimant to perform other work that exists in significant numbers in the national economy, such as the occupations of router, office helper, and mail clerk.  *Id.* at 23.  Therefore, the ALJ found Plaintiff not disabled within the meaning of the Social Security Act.  *Id.*

## PROCEDURAL HISTORY

Plaintiff filed suit with the Court to challenge the Commissioner's final decision on August 2, 2023.  Dkt. No. 1 at 1–2.  Plaintiff filed a brief on February 28, 2024, requesting reversal or remand for further administrative proceedings.  Dkt. No. 11.  The Commissioner filed a brief in opposition on April 26, 2024, Dkt. No. 14, and Plaintiff filed a reply brief on May 8, 2024, Dkt. No. 15.

---

[10] "Residual functional capacity" is defined as the "the most [the claimant] can still do" despite the claimant's limitations.  20 C.F.R. § 404.1545.

**LEGAL STANDARD**

Pursuant to 42 U.S.C. § 405(g), a district court may affirm, modify, or reverse a final decision of the Commissioner of Social Security.  A reversal may be with or without remand for rehearing.  *Id.*  The reviewing court may set aside the agency's disability determination "only where it is based upon legal error or where its factual findings are not supported by substantial evidence."  *Rivera v. Comm'r of the SSA*, 2020 WL 8167136, at *12 (S.D.N.Y. Dec. 30, 2020) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2021 WL 134945 (S.D.N.Y. Jan 14, 2021).  The Court reviews the ALJ's decision in two stages.

First, the Court must decide whether the Commissioner failed to apply the correct legal standards.  *See, e.g., Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)) (remanding for noncompliance with regulations).  A court reviews the ALJ's application of legal standards de novo. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *Thomas v. Astrue*, 674 F. Supp. 2d 507, 530 (S.D.N.Y. 2009).

Absent a finding of legal error, a reviewing court moves to the second stage of its review and considers whether the ALJ's decision was supported by substantial evidence.  *See, e.g.*, *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) ("First, the Court reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standards . . . Next, the Court examines the record to determine if the Commissioner's conclusions are supported by substantial evidence"); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008) (same), *report and recommendation adopted*, 2008 WL 449357 (S.D.N.Y. Oct. 1, 2008). "Substantial evidence . . . 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In applying the substantial evidence standard, the Court "does not determine de novo whether [the Plaintiff] is disabled." *Halloran v. Barnhart*, 362 F. 3d 28, 31 (2d Cir. 2004) (per curiam) (internal quotation marks and citation omitted).  Rather, "once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Comm'r of the Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks and citation omitted).  The Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision."  *Id*. at 447; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed us that the factual findings of the [Commissioner], if supported by substantial evidence, shall be conclusive.  We would be derelict in our duties if we simply paid lip service to this rule, while shaping our holding to conform to our own interpretation of the evidence." (internal citations omitted)).  This means that even if there is also evidence to support a contrary finding, deference must be given to the Commissioner.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." (internal quotation marks and citations omitted)).

As the factfinder, the ALJ need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), nor "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). But the ALJ must not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of the Soc. Sec. Admin.*, 557 F.3d 79, 82–84 (2d Cir. 2009). And the ALJ must discuss "crucial factors in any determination with sufficient specificity to enable the reviewing courts to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

## DISCUSSION

Plaintiff argues that the ALJ's assessment of her RFC was not supported by substantial evidence. Plaintiff contends that the ALJ relied upon his own lay opinions, failed to properly consider her subjective complaints, and did not adequately develop the record. Dkt. Nos. 11, 15. The Administration responds that the ALJ's findings are supported by substantial evidence. Dkt. No. 14.

## I.    Mental RFC

The ALJ found that the evidence of Plaintiff's mental ailments supported a limitation to "simple, routine tasks with regular breaks at two-hour intervals, decision-making and changes in the work setting commensurate to those found in simple, routine tasks, and occasional interaction with coworkers, supervisors, and the public." *Id.* at 20. Plaintiff argues that in reaching this conclusion, the ALJ improperly relied on lay evaluation of Plaintiff's treatment notes rather than properly developing the record to substantiate Plaintiff's mental RFC. Dkt. No. 11 at 10–20. The Court agrees.

In a Social Security proceeding, "[a]n ALJ has an affirmative duty to develop the record." *Hunter v. Comm'r of Soc. Sec.*, 2023 WL 2604913, at *2 (2d Cir. Mar. 23, 2023).  This duty reflects "the essentially non-adversarial nature of a benefits proceeding."  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982); *see Sims v. Apfel*, 530 U.S. 103, 111, (2000) ("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.").  Regulations specifically require the ALJ to make an initial request for necessary evidence from medical sources as well as a follow-up request 10 to 20 days later.  20 C.F.R § 416.912(b); *see Telesco v. Comm'r of Soc. Sec.*, 577 F. Supp. 3d 336, 353 (S.D.N.Y. 2021), *report and recommendation adopted*, 2022 WL 719271 (S.D.N.Y. Mar. 10, 2022).  Moreover, an ALJ "must ensure that '[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity.'"  *Malone v. Comm'r of Soc. Sec.*, 2022 WL 4134368, at *11 (S.D.N.Y. Aug. 6, 2022), *report and recommendation adopted sub nom. Malone v. Commissioner of Soc. Sec.*, 2022 WL 4134510 (S.D.N.Y. Sept. 12, 2022) (quoting *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007)).  "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

For claims filed before March 27, 2017, regulations required an ALJ to follow the "treating physician rule": a presumption that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).  Under this rule, courts often

held that "[b]ecause the treating physician rule 'dovetails' with the ALJ's duty to develop the record," an ALJ who failed to request an opinion from a claimant's treating source had failed to properly develop the record. *Fields v. Saul*, 2020 WL 3041489 (S.D.N.Y. June 8, 2020) (quoting *Beller v. Astrue*, 2013 WL 2452168, at *18 (S.D.N.Y. June 5, 2013)), *report and recommendation adopted sub nom. Fields v. Comm'r of Soc. Sec.*, 2020 WL 3546912 (S.D.N.Y. June 30, 2020)); *see Beller*, 2013 WL 2452168, at *18 (collecting cases). This makes sense, because the absence of an opinion which has presumptively controlling weight is normally an "obvious gap[]" which renders the record incomplete. *Rosa*, 168 F.3d at 79 n.5.

However, even under the treating physician rule, "an ALJ's failure to obtain a treating source opinion did not necessarily require remand." *Edwards v. Comm'r of Soc. Sec. Admin.*, 2023 WL 6173526, at *12 (S.D.N.Y. Sept. 22, 2023). In some cases, even without such an opinion, "the record contain[ed] sufficient evidence from which an ALJ [could] assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x. 29, 34 (2d Cir. 2013). For example, when there was a "voluminous medical record" that itself "include[d] an assessment of [the claimant's] limitations," this was "adequate to permit an informed finding by the ALJ." *Id.* at 34. The issue was "at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015). Given the importance of a medical opinion from a claimant's treating physician, such an opinion would often be required for an informed decision to be made. *See, e.g.*, *Romero v. Commissioner of Social Security*, 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020) (collecting cases). But in some cases, the record was sufficiently complete and comprehensive to support an ALJ's RFC finding even in the absence of such an opinion. *See, e.g.*, *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (ALJ had full treatment notes from the claimant's

doctors and also relied in part on the findings of a consultative examiner); *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (ALJ based his findings on the evaluation of a consultative psychologist as well as a "complete medical history and treatment notes, which themselves contained multiple psychological assessments").

For claims filed after March 27, 2017, the opinion of a treating physician is no longer presumptively controlling. *See Acosta Cuevas v. Comm'r of Soc. Sec*, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022). The new regulations provide that the ALJ will not defer to any particular medical opinion; instead, the ALJ will evaluate the persuasiveness of any medical opinion based on the opinion's supportability, the opinion's consistency with other evidence, the medical source's relationship to the claimant, and the medical source's specialized education or training. *See* 20 C.F.R. § 404.1520c; *Acosta Cuevas*, 2021 WL 363682, at *9. To the extent that the new regulations deemphasize the opinion of the treating physician, the duty to develop the record by requesting the opinion of such a physician should be correspondingly lessened.

However, courts in this Circuit have generally held that the duty to request such an opinion remains strong, and the framework developed under the treating physician rule remains substantially in place. *See Acosta Cuevas*, 2021 WL 363682, at *9 ("[W]hile the treating physician's rule was modified, the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar.") (collecting cases); *Brooks v. Kijakazi*, 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) ("[D]espite the new regulations, an ALJ's duty to develop the record takes on heightened importance with respect to a claimant's treating medical sources.");

*Edwards*, 2023 WL 6173526, at *13 ("Although the treating physician rule has been abolished, the principle espoused by *Tankisi* still applies: whether remand is required because of failure to obtain an opinion from the claimant's treating physician depends on whether the ALJ could have reached an informed decision based on substantial evidence without it."); *Manzella v. Comm'r of Soc. Sec.*, 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted,* 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021). These courts have reasoned that "[a]lthough the 'treating physician rule' no longer applies," the *reasons* for adopting the rule persist, "as the opportunity to observe and treat the claimant constitutes important 'support' for a medical opinion under the new medical opinion review standard." *Angelica P. v. Comm'r of Soc. Sec.,* 2023 WL 2366913, at *4 (S.D.N.Y. Mar. 6, 2023). Similarly, to the extent that the new regulations place weight on the length, frequency, and extent of the treatment relationship, 20 C.F.R. § 404.1520c(c)(3), a treating physician will often be the doctor who has examined the claimant most consistently and closely over the longest period of time, *see Brooks*, 2022 WL 213994, at *17 (observing that treating medical sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.") (quoting *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017)). Thus, the treating physician "rule" is replaced by a simple understanding that in many though not all cases, a treating physician's assessment of the claimant's capacities is critical to a fully informed understanding of the claimant's alleged disability.

Assessment by a medical source with longitudinal experience with the claimant is especially important in cases involving mental health impairments. *Estrella v. Berryhill*, 925

F.3d 90, 98 (2d Cir. 2019) ("[I]n the context of mental illness . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health."); *Sanchez*, 2015 WL 736102, at *7 ("Sanchez's particular conditions—bipolar disorder, with notations as to schizophrenia as well—are long-term disorders whose gravity and impact vary by individual.  A treating psychiatrist's insights, which may capture what a one-time visit to a consulting psychologist cannot, would be obviously valuable."); *Marinix R. v. Comm'r of Soc. Sec.*, 2024 WL 4579477, at *4 (S.D.N.Y. Oct. 25, 2024) ("[T]he records and opinions of treating providers are particularly probative in claims involving mental health.").  Courts in this Circuit have consistently recognized that "[t]he ALJ's duty to develop the record is 'enhanced when the disability in question is a psychiatric impairment.'"  *Edwards*, 2023 WL 6173526, at *13 (quoting *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012)), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012)); *see Marinix R.*, 2024 WL 4579477, at *4; *Primo v. Berryhill*, 2019 WL 2453343, at *13 (S.D.N.Y. Feb. 19, 2019), *report and recommendation adopted sub nom. Primo v. Comm'r of Soc. Sec.*, 2021 WL 1172248 (S.D.N.Y. Mar. 29, 2021).  Mental health cases are "not susceptible to clear records such as x-rays or MRIs.  Rather, they depend almost exclusively on less discretely measurable factors, like what the patient says in consultations."  *Flynn v. Comm'r of Soc. Sec. Admin.*, 729 F. App'x 119, 122 (2d Cir. 2018) (summary order); *see Telesco*, 577 F. Supp. 3d at 354; *Merriman v. Commissioner of Social Security*, 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015).  Moreover, "a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating more thorough review."  *Marinez*, 269 F. Supp.3d at 215.  In completing the type of holistic assessment required in mental health cases, the opinion of medical sources familiar with the patient is especially useful.  *See*

*Telesco*, 577 F. Supp. 3d at 354 ("[T]he longitudinal relationship between a mental health patient and [their] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be achieved with a single consultative examination." (quoting *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015))).

Here, the ALJ did not request an assessment from Plaintiff's mental health providers of her functional capacity.  The ALJ also did not order a consultative examination of Plaintiff by a mental health clinician and did not ask her any questions about the relationship between her psychological symptoms and her ability to work.  The ALJ relied solely on notes from Plaintiff's treatment, Plaintiff's self-reported work history and ability to perform tasks of daily living, and interpretation of such records by state agency medical examiners at previous levels of review who did not treat or examine Plaintiff.  This record was not sufficient to support an informed assessment of Plaintiff's mental RFC.

The record does not contain, and the ALJ did not request, any assessment of Plaintiff's psychological capabilities from any medical source who had personally treated or examined Plaintiff.  This is true despite the fact that there is an obvious source for such an assessment, NP Khalil, who had seen Plaintiff approximately monthly for seven years and could provide a longitudinal assessment of the "less discretely measurable" factors relevant to the Plaintiff's ability to function in the workplace while managing her schizoaffective disorder.  *Flynn*, 729 F. App'x at 122 (summary order); *see Telesco*, 577 F. Supp. 3d at 354.  Both before and after the new regulations, courts in this District have regularly held that the duty to develop the record was not satisfied when the ALJ relied on one-time consultative examinations or raw treatment records without requesting opinions from treating physicians who could provide more "rich and nuanced" insight into a claimant's mental impairments.  *Telesco*, 577 F. Supp. 3d at 354–55

(applying new regulations); *see Acosta Cuevas*, 2021 WL 363682, at \*11 (applying new

regulations, and collecting cases under the old regulations); *Angelica P.*, 2023 WL 2366913, at

\*4 (applying new regulations); *Castel v. Saul*, 2020 WL 5775668, at \*18 (S.D.N.Y. Sept. 1,

2020) (applying old regulations), *report and recommendation adopted*, 2020 WL 5775033

(S.D.N.Y. Sept. 28, 2020); *Sanchez*, 2015 WL 736102, at \*7 (applying old regulations).

The record also does not contain a consultative examination of Plaintiff's mental

capacity. The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of

consultative physicians after a single examination," especially in the context of mental illness.

*Estrella*, 925 F.3d at 98 (quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013)).

Nevertheless, a consultative examiner would at least be able to provide an opinion on Plaintiff's

specific functional capacities relevant to her RFC, such as the ability to concentrate, interact with

others, and sustain a routine, based on personal examination of Plaintiff. Such an opinion may

be useful in painting a complete picture of a claimant's mental impairments, especially when

combined with treatment notes and other evidence. *See Wayne Kenneth R. v. Comm'r of Soc.*

*Sec.*, 2022 WL 4537909, at \*6 (S.D.N.Y. July 4, 2022) (finding no need for opinion of treating

physician when "[t]he ALJ's conclusion was supported by a reasonable reading of the record and

by . . . a consultative psychiatric evaluation"), *report and recommendation adopted sub nom.*

*Reed v. Comm'r of Soc. Sec.*, 2022 WL 4538942 (S.D.N.Y. Sept. 28, 2022).

The failure to obtain an assessment of Plaintiff's functional capacity from a physician

who had treated or at least examined Plaintiff is exacerbated by the fact that the ALJ's

questioning of Plaintiff about her mental impairment was cursory. The ALJ questioned Plaintiff

in some depth about her hobbies, work history, and physical ailments, Ad. Rec. 35–44, but

regarding her mental impairment asked only "[w]hat symptoms do you still have?" *Id.* at 45.

After Plaintiff gave a narrative answer describing how, in her prior job, she "literally heard voices all day," and now she has "got most of that under control," but "still hear[s] voices," as well as having serious trouble sleeping and waking up in the morning, the ALJ asked if that was all and then closed the hearing. *Id.* at 45–46. The ALJ did not follow up with any questions regarding, for example, Plaintiff's ability to wake up in the morning for work or how the voices she still hears affect her concentration or interaction with others. The duty to develop the record includes "the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Cruz v. Astrue*, 941 F. Supp. 2d 483, 495 (S.D.N.Y. 2013); *see Maldonado v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 183, 194 (S.D.N.Y. 2021) (remanding when "[t]he ALJ asked essentially no specific questions about the numerous mental conditions that Maldonado alleged she had or that were reflected in records already before the ALJ"). The ALJ relied on Plaintiff's testimony about her habits, daily activities, and social interactions. Ad. Rec. at 17, 20. Eliciting testimony about her ability to function in a work setting could have provided support for her mental RFC in the absence of opinions from treating or examining physicians.

"Courts in this Circuit have held that when an ALJ has to determine an RFC, her failure to request a functional assessment when no such assessment exists in the record . . . constitutes a failure of her duty to develop the record." *Brooks*, 2022 WL 213994, at *17; *see Acosta Cuevas*, 2021 WL 363682, at *11; *Hart v. Comm'r of Soc. Sec.*, 2023 WL 2873247, at *8 (S.D.N.Y. Feb. 16, 2023) ("[N]one of the medical records considered by the ALJ contain any assessment of Plaintiff's functional limitations that may have served as a basis for the ALJ's RFC."), *report and recommendation adopted*, 2023 WL 2424129 (S.D.N.Y. Mar. 9, 2023). Here, the only functional assessments of Plaintiff were from agency medical reviewers who crafted their views

28

from a cold record.  In the context of Plaintiff's mental impairments, which "tend to be less susceptible to objective testing and assessment" *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022*)*, making no attempt to further develop the record was error.  "The lack of a functional assessment from a source familiar with [Plaintiff's] impairments . . . was an 'obvious gap' in the record."  *Brooks*, 2022 WL 213994, at *17.  By inferring Plaintiff's mental ability to function in a work setting from her treatment notes and daily activities rather than seeking more information, the ALJ improperly filled "this evidentiary void with his own medical judgment and interpretation."  *Lee v. Saul*, 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020).

The Commissioner argues that the ALJ properly relied on the findings of the administrative medical reviewers, which were consistent with Plaintiff's "largely normal mental status exam findings," self-reported daily activities, and "interest in obtaining part-time work." Dkt. No. 14 at 17.  The Commissioner also relies heavily on *Schillo v. Kijakazi*, 31 F.4th 64 (2d Cir. 2022) in arguing that "the ALJ is not required to rely on *any* medical opinion, let alone an opinion from a plaintiff's own medical source, in making a disability decision."  Dkt. No. 14 at 20.

Initially, it is important to distinguish between the ALJ's decision not to rely on a medical opinion and the ALJ's decision not to solicit such opinion.  *Schillo* and related cases have held that "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence."  31 F.4th at 78; *see id*. ("[W]e also reject Schillo's argument that, having declined to afford controlling weight to any of the three physicians' opinions, the ALJ was thereby prohibited from making an RFC finding whatsoever."); *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his

decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  However, in many such cases, the ALJ relies in part on the medical opinion or opinions, while also discounting them in part and giving them less than controlling weight.  *See, e.g.*, *Schillo*, 31 F.4th at 78 ("As the ALJ accorded the treating physicians' opinions *lesser* and not *no* weight, she still considered their conclusions to assess Schillo's RFC."); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (summary order).  When an ALJ does not solicit an opinion at all, any opinion which could have been solicited is not part of the record and necessarily carries no weight.  Therefore, the relevant line of cases is not *Schillo* and related cases in which the ALJ crafted an RFC from one or more non-controlling medical opinions combined with other evidence, but *Tankisi* and related cases in which the ALJ did not request opinions at all.  *See Hart*, 2023 WL 2873247, at *8 (distinguishing *Schillo* on the basis that "there is no opinion from *any* treating physician in the record here regarding Plaintiff's physical limitations.").

    In such a case, an ALJ's decision may still be affirmed if "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."  *Tankisi*, 521 Fed. App'x. at 34.  Here, however, the record was not sufficient.  Although the record contains years' worth of treatment notes from NP Khalil, these notes consist almost entirely of form text with little to no description of the Plaintiff's general functioning.  *See Sanchez*, 2015 WL 736102, at *7–8.  For example, in a representative note on July 8, 2021, the only unique text is "was using more Ativan for her anxiety voices stopped denied paranoia."  Ad. Rec. at 829. The bulk of the note falls under the heading "**EXAM**," which includes categories such as "mood/affect," "thought process/continuity," "perceptual disturbances," and "impulse control" with brief notations stating, for example, that Plaintiff was or was not hallucinating and that her

mood was "anxious," "calm," or "blunted." *Id.* Thus, the notes reveal for each session whether on that day Plaintiff was presenting with, for example, hallucinations or impaired judgment, as well as brief narrative glimpses into her condition.

These records "lack the sorts of nuanced descriptions and assessments that would permit an outside reviewer to thoughtfully consider the extent and nature of [plaintiff's] mental-health conditions and their impact on her RFC." *Sanchez*, 2015 WL 736102, at *7–8. Reports from NP Khalil that on various dates in 2021 Plaintiff was "improved less depressed more social and more calmer," Ad. Rec. at 833, 842, "tolerated meds well," *id.* at 838, or "stable and uneventful," *id.* at 840, are too vague and cursory to support a conclusion that Plaintiff could properly function in the workforce with "regular breaks at two-hour intervals . . . simple, routine tasks, and occasional interaction with coworkers, supervisors, and the public," *id.* at 20. The notes generally suggest that Plaintiff is doing better than when she was hospitalized in October 2020, but do not speak to her specific capacities to complete tasks, maintain concentration over long periods, or interact with others in a work setting. *See Guillen v. Berryhill*, 697 F. App'x. 107, 109 (2d Cir. 2017) (summary order) ("The medical records discuss her illnesses and suggest treatment for them, but offer no insight into how her impairments affect or do not affect her ability to work."); *Castel*, 2020 WL 5775668, at *18 ("Although Plaintiff's treatment records are 'undoubtedly relevant,' they 'provide [no] meaningful, objective indication of [P]laintiff's ability to perform the mental . . . demands of work.'" (quoting *Lilley v. Berryhill*, 307 F. Supp. 3d 157, 159–60 (W.D.N.Y. 2018))).[11]

---

[11] The four treatment notes from LCSWR Shingala, Ad. Rec. at 712–723, which provide a much more nuanced picture of Plaintiff's impairments over a brief time period, only highlight the difficulties with relying on the notes from NP Khalil. The notes from LCSWR Shingala strongly suggest that Plaintiff was hearing voices during the relevant time, despite NP Khalil not

Moreover, Plaintiff's treatment records do not uniformly point in one direction but are inconsistent and often unclear.  For example, on June 22, 2021, NP Khalil reports that Plaintiff "said the voices have stopped and the paranoia is better," but it is not clear what "stopped," and "better" are referring to, as the notes describe no voices or paranoia since February 2021.  *Id.* at 808–18.  On July 8, 2021, NP Khalil's note says, "voices stopped denied paranoia," but on the same day Plaintiff discussed "different strategies to deal with the voices" at length with LCSWR Shingala.  *Id.* at 828–29.  On August 8, 2021, NP Khalil simultaneously reports that Plaintiff is "improved less depressed more social and more calmer" and that "eye contact was fair to poor," "tone and volume monotone," and "affect blunted and mood incongruent to reported 'good' mood."  *Id.* at 833.  The ALJ understood these records to show that "when Plaintiff was consistent with her psychiatric medications, her hallucinations ceased and her mental status examination findings were largely normal."  Dkt. No. 14 at 18.  However, this summary glosses over inconsistency in the notes that may be relevant to Plaintiff's mental RFC and could have been clarified by solicitation of further information.[12]  *See Molina v. Saul*, 2019 WL 5287943, at *32 (S.D.N.Y. Sept. 28, 2019) ("The ALJ was not entitled to conclude that the [mental status]

---

reporting this, and describe a clinical dialogue regarding Plaintiff's readiness to work which was not clearly resolved.  *Id.*  If similar information was available throughout Plaintiff's medical records, this might well be a case where the treatment notes alone were sufficient to support an RFC finding.  *See Tankisi.*, 521 Fed. App'x. at 34; *Swiantek*, 588 F. App'x at 84.

[12] To the extent that the ALJ's decision can be read to rely solely or primarily on Plaintiff's stability between August 2021 and January 2022, absent a medical opinion it is not clear that these few months of relatively positive treatment notes represent a sustainable improvement in Plaintiff's condition.  *See Estrella*, 925 F.3d at 97 ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)).  This conclusion is especially tenuous because Dr. Sherer's initial assessment of Plaintiff's capabilities, which was nearly identical to Dr. Bruni's later review as well as the ALJ's determination, occurred before this period of purported stability.  Ad. Rec. at 62–68.

examinations were 'largely normal,' while disregarding or glossing over these problematic

findings, without explanation."); *Alvarado v. O'Malley*, 2024 WL 1073293, at *14 (S.D.N.Y.

Jan. 30, 2024) (noting that in the absence of medical opinion evidence, "Courts uphold an ALJ's

RFC assessment 'only where the record is clear'" (quoting *Staggers v. Colvin*, 2015 WL

4751123, at *3 (D. Conn. Aug. 11, 2015))), *report and recommendation adopted*, 2024 WL

1344064 (S.D.N.Y. Mar. 29, 2024).

      The ALJ and Commissioner also place importance on the fact that Plaintiff reports being

able to care for herself and has sought jobs during the period of her alleged impairment.  Ad.

Rec. at 20; Dkt. No. 14 at 18–19.  Although the ALJ may properly consider a claimant's

activities of daily living as evidence of what the claimant is able and unable to do, *Cherry v.

Comm'r of Soc. Sec. Admin*., 813 F. App'x 658, 662 (2d Cir. 2020) (summary order) (citing 20

C.F.R. §§ 404.1529(c)(3)(i)), an ALJ must be cautious in inferring that workplace activities are

analogous to activities of daily living, *Rucker*, 48 F.4th at 93 (collecting cases).  It is not apparent

that Plaintiff's ability to prepare her own meals, pay her bills, and attend church substantially

supports that she can function effectively in a work setting with regular breaks at two-hour

intervals.  *See* 20 C.F.R. Subpt. P, App. 1 § 12.00 (C)(6)(b) ("Your ability to complete tasks in

settings that are highly structured, or that are less demanding or more supportive than typical

work settings does not necessarily demonstrate your ability to complete tasks in the context of

regular employment during a normal workday or work week.").

      Similarly, while Plaintiff's decision to seek work may be relevant to the Commissioner's

determination, *see Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008), an ALJ cannot simply

infer from the fact that a claimant is seeking work that she is able to perform it within the

meaning of the Social Security Act, *see Solsbee v. Astrue*, 737 F.Supp.2d 102, 109 (W.D.N.Y.

2010) ("[E]mployment is not proof positive of ability to work since disabled people, if desperate . . . can often hold a job." (quoting *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir.1998))). Notably, although Plaintiff applied for a position as a receptionist and package handler in 2021, Ad. Rec. at 39–40, the ALJ found that Plaintiff was not able to perform her prior work as a receptionist and it is not clear whether she met the demands of the other job, *id.* at 21–22.  This illustrates the principle that a claimant's RFC is determined by the Commissioner based on the medical and non-medical evidence of the claimant's impairments, not by the claimant's subjective beliefs about what she is able and unable to do.  *See Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750 (S.D.N.Y. 2018) ("[T]he ALJ, 'after weighing objective medical evidence, . . . may decide to discredit the claimant's subjective estimation of the degree of impairment.'" (quoting *Tejada v. Apfel*, 167 F.3d 770, 775–76 (2d Cir. 1999))); *Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998))).

The lack of evidence in the record linking Plaintiff's mental impairment with her capacity to function in the workplace is not cured by the ALJ's reliance on opinions from state agency medical reviewers.  Though such reviewers are medical sources whose opinions may "constitute substantial evidence where . . . they are consistent with other medical evidence of record," *Edwards*, 2023 WL 6173526, at *15, they are only able to render opinions on the record they are given.  Where, as here, the record consists of extensive but "elliptical" treatment notes that do not "permit an outside reviewer to thoughtfully consider the extent and nature of [Plaintiff's] mental-health conditions and their impact on her RFC," the fact that an agency reviewer is

required to estimate a functional assessment from such notes does not mean the record was sufficient. *Sanchez*, 2015 WL 736102, at *8–9. Courts have repeatedly emphasized that in mental health cases, interpretation of a cold record will not generally substitute for the impressions of those who have treated and interacted with the claimant. *See id.; Rucker*, 48 F.4th at 92; *Marinix R.*, 2024 WL 4579477, at *4; *Telesco*, 577 F. Supp. 3d at 354; *Flynn*, 729 F. App'x at 122.

Because the record is not sufficiently developed to support Plaintiff's mental RFC, this case must be remanded to the Commissioner for further development of the record. On remand, the ALJ should further develop the record to support Plaintiff's mental RFC by soliciting a functional assessment from NP Khalil or other mental health providers who treated Plaintiff during the relevant period, obtaining an updated consultative examination, further questioning Plaintiff regarding her subjective experience of her impairments, and/or developing other evidence which would bear on Plaintiff's ability to function in a work setting. The ALJ should then reevaluate Plaintiff's mental impairments and reassess Plaintiff's RFC accordingly.

## II. Physical RFC

Plaintiff also contends that the ALJ's determination of her physical ability to perform light work with certain limitations[13] was not supported by substantial evidence. Plaintiff instead argues that the ALJ improperly relied upon his own lay opinion in determining several aspects of his physical RFC finding, and invented others "out of whole cloth." Dkt. No. 11 at 8, 22–23.

---

[13] Specifically, the ALJ found Plaintiff had the residual functional capacity to perform light work "except occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle and finger; avoid unprotected heights and hazardous machinery; able to perform simple, routine tasks with regular breaks at two-hour intervals, with decision-making and changes in the work setting commensurate to those found in simple, routine tasks; occasional interaction with coworkers, supervisors, and the public." Ad. Rec. at 18.

Defendant responds that the ALJ's physical RFC determination is consistent with the medical opinion of examining physician Dr. Puri and the records from her treating physician, Dr. Jacobs. Dkt. No. 14 at 21–23.  The Court holds that the ALJ's physical RFC determination is supported by substantial evidence.

The record is sufficiently developed to support a finding as to Plaintiff's physical RFC. Although Plaintiff's physical treatment records were not extensive, her physical ability to walk, squat, bend, lift, and take other relevant actions was specifically assessed by Dr. Puri.  *Id.* at 727–28.  In combination with Plaintiff's self-reports and records of treatment with Dr. Jacobs, there is sufficient evidence to allow informed assessment of the relevant physical capacities.

The ALJ found that Plaintiff's physical ailments were consistent with a limitation to "light work as defined in 20. C.F.R. § 404.1567(b), except occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle and finger; avoid unprotected heights and hazardous machinery."  Dkt. No. 9 at 18, 20.  "Light work" is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and may require "a good deal of walking or standing."  20 C.F.R. § 404.1567(b).[14]

This assessment is "consistent with the record as a whole."  *Matta v. Astrue*, 508 Fed. Appx. 53, 56 (2d Cir. 2013).  As cited by the ALJ, Plaintiff reports "diffuse muscle aches and joint pains, worse with standing and walking," and inability to stand or walk for long periods. Ad. Rec. at 327.  Moreover, Dr. Puri's examination found "trigger points . . . consistent with fibromyalgia" and "mild limitations" with respect to squatting, bending, kneeling, and lifting

---

[14] Relevant regulations define five categories of physical exertion, with "light work" the second-lowest. 20. C.F.R. § 404.1567.  The lowest category, "sedentary work," requires lifting no more than ten pounds, with walking and standing required "occasionally."  *Id.*

weights.  *Id.*  The ALJ reasonably concluded that this evidence "support[s] the restriction to light work," precluding a higher exertional level.  *Id.* at 21.  The ALJ specifically rejected the medical consultant's findings of "no medically determinable physical impairment" as unsupported by the evidence of Plaintiff's trigger points, lumbar tenderness, and "mild disc bulging on lumbar imaging."  *Id.* at 21.

At the same time, Dr. Puri found that Plaintiff had "a normal gait," "ability to change positions without issue," "full range of motion," and "strength [] intact in all extremities."  *Id.* at 20.  An MRI indicated "mild disc bulging" in the lumbar spine, but "no more."  *Id.*  Plaintiff reports being able to walk for multiple miles and walk or stand for up to two hours, though not more, and no difficulty performing daily activities such as preparing meals and shopping.  *Id.* at 246.  This evidence supports Plaintiff's ability to do light physical work rather than being limited to sedentary work.  *See Ruiz v. Comm'r of Soc. Sec.*, 625 F. Supp. 3d 258, 268 (S.D.N.Y. 2022) ("Courts in this circuit have consistently found that moderate limitations in a plaintiff's ability to perform exertional activities are consistent with an RFC for light work." (quoting *Renee L. v. Comm'r of Soc. Sec.,* 2022 WL 685285, at *9 (N.D.N.Y. Mar. 8, 2022))).

Plaintiff claims that the ALJ failed to identify the evidence supporting the "sitting, standing, walking, lifting, carrying, pushing, and pulling" required for light work.  Dkt. No. 11 at 22.  However, the ALJ cites to Dr. Puri's determination that Plaintiff has a "normal gait, mildly decreased squatting ability but intact heel and toe walking, ability to change positions without issue, and full range of motion," as well as a lack of "sensory or reflex deficits." as a basis for her capacity to perform light work.  Ad. Rec. at 20.  Dr. Puri also specifically evaluated Plaintiff's ability to balance and kneel, as well as the strength of her extremities.  *Id.* at 727.  Plaintiff's own statements are also generally consistent with the RFC and Dr. Puri's

examination.[15]  *Id.* at 42–46.  Plaintiff does not identify any particular activity contained in the RFC which she is unable to perform, nor is any such activity evident from the record.  As the ALJ's physical RFC determination is consistent with the mild limitations found on examination, and there is no evidence suggesting greater limitations, the determination is supported by substantial evidence.  *See Ruiz*, 625 F. Supp. 3d at 268 (records of examinations showing "mild" deficits in certain areas, without more, supported an RFC of light work).

**CONCLUSION**

Plaintiff's motion is GRANTED, and the case is remanded to the Commissioner for further proceedings.  On remand, the ALJ should further develop the record and reassess Plaintiff's mental RFC as stated herein.

SO ORDERED.

Dated: November 27, 2024
        New York, New York                    _____
                                              LEWIS J. LIMAN
                                              United States District Judge

---

[15] The only apparent inconsistency is between Plaintiff's testimony that she has difficulty firmly grasping objects and Dr. Puri's finding of "grip strength 5/5."  *Id.* at 727.  However, Dr. Puri's finding of "mild limitation lifting weights," *id.* at 728, partially accounts for Plaintiff's testimony, and the RFC limiting climbing, handling, and fingering may reflect this limitation.  Moreover, in resolving inconsistencies, the ALJ is entitled to credit Dr. Puri's examination over Plaintiff's subjective testimony.